Josephine Linker Hart, Justice, dissenting. I dissent for two reasons: this case is moot, and the 'majority erred in holding that the circuit court did not abuse its discretion in allowing the Beckhams permissive intervention in this case. First, this case is moot because the order appealed from was for a temporary guardianship that was established pursuant to Arkansas Code Annotated section 28-65-218. As such, the guardianship expired after ninety days. Id. Because the order was entered on February 26, 2015, the temporary guardianship expired nearly a year before we took this case. I am mindful that there are exceptions to the mootness doctrine, such as when cases hare capable of repetition, which arguably could be held to apply to case before us. However, by declaring that the circuit court’s intervention order had an effect beyond the proceeding in which the ruling was made in is not grounded in any rule, statute, or case law. The lack of any citation of authority in the majority opinion substantiates this point. In my view, the majority’s holding- on this matter is nothing, more than speculation that the circuit court will make the same ruling if a subsequent guardianship petition is filed. However probable it may be that the circuit court will make the same ruling, it does not change the undeniable fact that this court’s ruling will have no practical effect on the temporary guardianship; therefore, it must be moot. With regard to the merits, the circuit court erred in allowing the Beckhams to permissively intervene in this case. This manifestly wrong decision is attributable to a misinterpretation of Rule 24(b) of the Arkansas Rules of Civil Procedure: Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant’s claim or defense and ■ the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by‘a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the. rights of the original parties. Intervention is defined as “a proceeding by which a person, not originally a party to an action, is permitted to and does become a party to the pending proceeding for the protection of some right or interest alleged by him to be affected by the proceeding.” Gravett v. McGowan, 318 Ark. 546, 549, 886 S.W.2d 606, 607 (1994). Accordingly, to intervene, a party must have I ma claim or defense that is related to some right or interest. Mr. Whaley cites Reynolds v. Guardianship of Sears, 327 Ark. 770, 940 S.W.2d 483 (1997), as support for the proposition that the Beckhams had no “right or interest” in Mr. Whaley’s guardianship petition. Reynolds is analogous to the case before us. In Reynolds the appellant, like the Beckhams, sought to intervene in a guardianship case filed by a blood relative. The Reynolds court affirmed the circuit court’s finding that the appellant had no interest in the guardianship despite the prospect of financial gain as successor cotrustee and therefore had no standing to intervene. Here, the Beckhams, whether motivated by altruism or financial gain, likewise have no interest in Mr. Whaley’s petition for guardianship. Despite the Beckhams’ declaration of love for the Ward, I cannot ignore that they have benefitted from their association with this incapacitated 93-year-old woman. They live in a mobile home on the Ward’s property, rent free, as does their adult child. The Beckhams used the Ward’s two vehicles. At one point, Pam Beckham took $800,000 worth of CDs out of the Ward’s safe-deposit box and put them in her own safe-deposit box and returned them to the Ward only after that had been discovered by the Ward’s family members. The Beckhams also drilled open the Ward’s safe. ..In the course of “caring” for the Ward, in one year alone, the Beckhams caused more than $89,500 to be paid to individuals they selected as in-home healthcare providers. One of the “caregivers” was the' Beckhams’ nineteen-year-old son. Payments to the individuals providing “care” continued even when, the Ward was a patient in a pursing home. The extravagant expenditures for “caregivers” seem to belie Pam Beckham’s claim that she worked 40-5.0 hours per week caring for the Ward, including ^preparing her. meals. Under the uncontroverted facts that I have just recited, I cannot join the majority in lauding the Beckhams’ care for Ms. Shepherd.